**SIGNED this 12th day of October, 2012.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge

_____

Designated for on-line use, but not for print publication
# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In re:

DICKINSON THEATRES, INC.,

DEBTOR.

CASE NO. 12-22602
CHAPTER 11

## MEMORANDUM OPINION AND JUDGMENT DENYING DEBTOR'S MOTION FOR ORDER REJECTING, IN PART, THE AMENDED AND RESTATED MASTER LEASE AGREEMENT WITH SPIRIT MASTER FUNDING, LLC

Following an evidentiary hearing on October 4, 2012, the Court took under advisement Debtor's Motion for Order Rejecting, in Part, the Amended and Restated Master Lease Agreement with Spirit Master Funding, LLC (Dkt. 15), to which Spirit objected. (Dkt. 86).[1] The lease, which the Court will refer to as the Amended Master

---

[1] The parties agree that the Court has jurisdiction over this core matter. This proceeding to reject an unexpired lease is a contested matter. Fed. R. Bankr. P. 6006(a).

Lease, covers four theater locations, but Debtor seeks to reject the Amended Master Lease as to only one location, Palm Valley. The issue presented is whether Debtor may reject the Amended Master Lease as to only one location or whether Debtor must reject or assume the lease as a whole. Having carefully considered the exhibits, the testimony, the arguments of counsel, and the parties' written submissions, the Court is now ready to rule. For the reasons stated below, the Court denies the Motion.

**FINDINGS OF FACT.**

Dickinson Theatres, Inc., filed a voluntary petition under Chapter 11 on September 21, 2012. As debtor in possession, Dickinson continues to operate 18 movie theaters with 210 screens in seven states. All theaters are operated from leased facilities, four of which are governed by the Amended Master Lease between Debtor and Spirit which is at issue.

Spirit is a financing organization and has nothing to do with the theater business. In 2004, it purchased from Dickinson two of Dickinson's theater locations, Northglen and Eastglen, for $18,100,000. As provided in the sales contract, by a Master Lease Agreement dated July 28, 2004, Spirit leased the theaters back to Dickinson. A third theater location, Starworld, was purchased by Spirit from Dickinson on November 8, 2004, for $12,500,000. In accord with the purchase agreement, the 2004 master lease was amended to add the Starworld property, so the master lease covered all three properties. About a year later, Spirit bought two more properties from Dickinson, known as Palm Valley and Palazzo, for $26,100,000, and, as agreed in the sale contract, Dickinson and Spirit later entered into a master lease for these two properties.

2

On August 1, 2009, Spirit and Dickinson entered into an Amended and Restated Master Lease Agreement covering all five properties. In 2012, Dickinson approached Spirit for financial concessions. The parties agreed to at least four matters. (1) The lease for the Palazzo location was deleted from the 2009 master lease. (2) A separate lease for Palazzo was entered into by Spirit and Palazzo 16 Theatres, LLC, an entity in which a third party held a controlling interest and Dickinson had a 49% interest. (3) Spirit made a $500,000 loan to Dickinson. (4) Spirit and Dickinson entered into the First Amendment to the Amended Master Lease which, among other things, excluded the Palazzo property from the 2009 Master Lease. That Amended Master Lease, the term of which was extended by the amendment, now applies to four properties, including Palm Valley. The base annual rent for the period March 1, 2012, through February 28, 2014, is $3,359,346. The chief financial officer of Debtor testified as to a method for allocating rent among the four properties, from which he concluded that if the master lease were rejected as to Palm Valley, the rent for 2012-2014 should be reduced by $61,416.56.

The theater operated by Debtor at the Palm Valley property loses about $300,000 per year. Debtor therefore seeks to reject the Amended Master Lease as to Palm Valley, but not the other three properties. Because the Court concludes the motion to reject in part the Amended Master Lease must be denied, it makes no finding as to the rent attributable to the Palm Valley property.

**ANALYSIS.**

The parties agree as to the governing legal principles. Section 365(a) of the

Bankruptcy Code permits a debtor in possession, subject to court approval, to assume or reject an executory contract or unexpired lease to which the debtor is a party.  The business judgment rule is traditionally applied when determining whether to authorize rejection.  However, "[i]f the debtor decides to assume a lease, . . . it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed."[2]  Stated differently, "[t]he general rule is that in order for a contract to be assumed or rejected under § 365 of the Bankruptcy Code, that contract must be assumed or rejected in its entirety."[3]  But there is an exception:  "[W]here a contract, though contained in a single document, is divisible into several different agreements, some of the divisible agreements may be assumed or rejected under § 365 without assuming or rejecting the entire contract."[4]  The question here is whether the Amended Master Lease is divisible or severable for purposes of rejection under § 365.

Whether a contract or lease is divisible for purposes of assumption or rejection is determined by the state law governing the agreement.[5]  For purposes of the Motion, Spirit does not challenge Debtor's position that either the law of Kansas or Delaware applies and that the tests for severability in those states are nearly identical.[6]  The Court will

---

[2] *In re Buffets Holdings, Inc.,* 387 B.R. 115, 119 (Bankr. D. Del. 2008).

[3] *In re Convenience USA, Inc.*, 2002 WL 230772, *2 (Bankr. M.D.N.C. 2002).

[4] *Id.*

[5] *E.g.*, *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 389 (Bankr. N.D. Tex. 2003).

[6] Dkt. 86 at 3.

therefore apply Kansas law. "A severable or divisible contract is one that 'includes two or more promises each of which can be enforced separately, so that failure to perform one of the promises does not necessarily put the promisor in breach of the entire contract.'"[7] Under Kansas law "[w]hether or not a contract is entire or divisible is a question of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it."[8] Under Kansas contract law, "[i]f the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction."[9]

The Amended Master Lease expressly and unambiguously states the master lease is not divisible. Section 31 addresses characterization of the agreement. It provides in part:

> B. The following expressions of intent, representations, warranties, covenants, agreements, stipulations and waivers are a material inducement to Lessor entering into this Lease:
>
> (i) It is the intent of the parties hereto, and the parties acknowledge and agree that they have executed and delivered this Lease with the understanding that (1) this Lease constitutes an unseverable and single lease of all, but not less than all, of the Properties . . . .

---

[7] *Cafeteria Operators*, 299 B.R. at 389 (*quoting* Black's Law Dictionary 324 (7th ed. 1999)).

[8] *Blakesley v. Johnson*, 227 Kan. 495, 500-501, 608 P.2d 908, 913 (1980) (*citing Big Chief Sales Co., Inc. v. Lowe*, 178 Kan. 33, 39, 283 P.2d 480 (1955) and *Sykes v. Perry*, 162 Kan. 365, 369-70, 176 P.2d 579 (1947)).

[9] *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.2d 888 (2011).

> (iii) Lessee waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and as a master lease of all of the Properties. Lessee stipulates and agrees (1) not to challenge the validity, enforceability or characterization of the lease of the Properties as a true lease and/or as a single, unseverable instrument pertaining to the lease of all, but not less than all, of the Properties, and (2) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 31.B.

Dickinson's right to occupancy and its performance obligations under the Amended Master Lease reflect its unitary nature. For example, Debtor is given the right to occupy all four properties for the same lease term without any distinctions. The rent for all four properties is a lump sum without attribution to the specific properties. The definition of default includes nonpayment of any monetary obligation, and default gives the lessor the option to terminate the lease as to all properties, as well as other remedies.

The parties have cited the Court to three decisions addressing partial rejection of master leases, but none of these cases construe a master lease which expressly states the parties' intent that the lease be an indivisible and unseverable lease of multiple properties. Likewise, the Court's own research has not located any such case. The Court therefore relies upon the general principle of Kansas contract law that where the terms of a written contract are clear, there is no occasion to resort to rules of construction. In this case, the Amended Master Lease expressly and unambiguously provides that it constitutes "an unseverable and single lease of all, but not less than all, of the Properties." The parties' intent can be determined from the terms of the Amended Master Lease, and these terms

6

are controlling. Based upon this analysis alone, the Court should deny the motion to reject only part of the Amended Master Lease.

Debtor seeks to avoid this result by relying upon two cases, *Cafeteria Operators*[10] and *Convenience USA*,[11] where master leases of multiple real properties were held to be divisible. In *Cafeteria Operators*, the debtor, Furr's Cafeteria, was a party to a master sublease agreement in which it agreed to sublease 43 separate restaurant facilities from K Mart Corporation, pursuant to the terms of the master sublease agreement. The debtor sought to reject the master sublease as to some but not all of the properties. When determining if the sublease was severable, the court applied Michigan law under which "[t]he singleness or apportionability of the consideration"[12] was the principle test, and whether "the terms, nature, purpose and intention of the parties" supported the conclusion that the master sublease was "susceptible of division or apportionment"[13] was also considered. The court found the parties intended that each individual premise's lease could be operated separately and independently from the others based upon the following factors. (1) Rent was apportioned among the 43 individual properties. (2) The primary term of the sublease was different for individual groups of properties. (3) Upon default, the landlord was entitled to terminate, re-enter, repossess, and/or relet all or part of the

---

[10] 299 B.R. 384.

[11] 2002 WL 230772.

[12] *Cafeteria Operators*, 299 B.R. at 389 (*quoting Dumas v. Auto Club Ins. Assoc.*, 437 Mich. 521, 473 N.W.2d 652, 659 (1991)).

[13] *Cafeteria Operators*, 299 B.R. at 389.

properties. (4) The integration clause of the sublease stated that the parties acknowledged "that this Sublease is an integrated and single Sublease enforceable with respect to all or any of the Premises in accordance with its terms."[14] (5) The sublease provided for severance if the debtor sublet any individual property to a third party. The court then concluded that there was nothing in the subject matter of the sublease indicating that the individual restaurant locations could not be operated separately and independently of each other. Finally, the conduct of parties, including positions taken in prior pleadings, showed they had treated the sublease as severable.

The second case on which Debtor relies is *Convenience USA*.[15] In that case, the debtors leased 27 convenience stores from six landlords named in a master lease and sought to reject the master lease as to six of the leased premises. When determining that the lease was divisible, the court applied a three-part test under Texas law which focused upon the intent of the parties, the subject matter of the agreement, and the conduct of the parties. Indication that the parties intended the lease to be divisible was found in several lease terms, including a provision for apportionment of rent and the assignment of amounts of specific rent to each of the 27 locations, a provision which provided a means to calculate the rent reduction in the event that the landlords sold any of the properties or any of the lease properties were destroyed during the lease term. The term that the obligations of the six landlords were several, not joint and several, also evidenced that the

---

[14] *Id.* at 391.

[15] 2002 WL 230772.

lease was intended to be severable. As to the second element of the test under Texas law, the subject matter of the lease, the court concluded there was nothing in the evidence or in the lease that suggested the various stores could not be operated separately. As to the conduct of the parties, the fact that the rent was paid in a lump sum was held to have little significance, since the lease included a method whereby lease payments could have been allocated to each location.

Dickinson argues that the evidence in this case supports finding the Amended Master Lease divisible based on the similarity of this case to the facts in *Cafeteria Operators* and *Convenience USA*. As to intent that the Amended Master Lease be severable, Debtor relies upon four sections of the agreement which give Spirit the option to act with respect to fewer than all the properties. The first of these is section 18, labeled Condemnation and Casualty. Subsection 18(B) grants the lessor the option, in the event of partial condemnation or casualty, to terminate the lease with respect to all properties or only with respect to the property affected. Subsection 18(C) gives the lessor the right, if restoration is uneconomic, to terminate the lease with respect to the applicable property only. The second is the portion of section 20 addressing the remedies for default, which gives the lessor the option to terminate the lease as to fewer than all properties and includes a provision allowing for the allocation of rent among the properties. The third is section 23, labeled Assignment. Subsection A gives the lessor permission without the consent of lessee to sell, assign, transfer, finance, convey, or refinance all or any portion of the properties. The fourth is section 38, labeled Securitizations, which grants the lessor

9

the authority to enter into securitization transactions backed by interests in all or a portion of the properties. Debtor contends these provisions are inconsistent with the express statement of indivisibility in section 31, quoted above.

Although the Debtor's analysis is similar to that of the *Cafeteria Operators* court, this Court is not convinced the analysis should lead to the conclusion that the Amended Master Lease is severable. First, there is no discussion in *Cafeteria Operators* of an express statement of intent that the lease be nonseverable. Second, there is a significant difference between the Michigan law applied in *Cafeteria Operators* and the Kansas law applicable to this case. Under Michigan law, the "singleness or apportionability of the consideration " and the terms, nature, and purpose of the contract are very significant. In Kansas, the intent of the parties plays an elevated role. Further, the Court disagrees with Dickinson that the foregoing evidence strongly supports the position that the parties intended the Amended Master Lease to be severable. The foregoing sections evidence that Spirit retained for itself remedies and rights based upon fewer than all the properties in well-defined circumstances; the sections do not evidence that the parties intended independent leases of four properties and combined them in a single document simply for convenience. Also, unlike *Cafeteria Operators*, in this case, the consideration is not apportioned among the properties, and the lease term is the same for all properties. The Amended Master Lease is also materially different from the master lease at issue in *Convenience USA*, since there is no allocation of rent and there is only one landlord, Spirit, rather than the six separate landlords named in the Convenience USA lease.

10

Finally, as to terms of the Amended Master Lease, Dickinson argues that the severability clause evidences that it should be construed as divisible. The clause is a standard provision stating that the provisions of the master lease shall be deemed severable, so that if any part is deemed unenforceable, the remainder shall remain in full force and effect. The clause addresses severability of clauses of the Amended Master Lease, not the severability of the subject matter of the lease.

Other than the above-quoted language from section 31 stating that the Amended Master Lease is intended to be nonseverable, there is no direct evidence concerning the intent of the parties when negotiating the terms of the Amended Master Lease on which Dickinson relies. The only witnesses at trial were two representatives of Dickinson, neither of whom was involved in the transactions whereby Spirit acquired the theater properties and leased them back to Dickinson. They did not testify as to why the rental of all properties was combined into a master lease. However, one witness did acknowledge that such combination limits Spirit's risk.

Dickinson contends that the parties' conduct evidences severability. First, it argues that severability is evidenced by the amendment of the 2009 Amended Master Lease to exclude the Palazzo 16 Theatre and place it in a single property lease. As stated by Debtor, this does evidence that any of the leased theater properties "are capable of operating independently and separately" from each other.[16] Although this consideration

---

[16] Dkt. 15, at 12.

11

was important in both *Cafeteria Operators* and *Convenience USA*, the Court finds it not to be significant under Kansas law. The fact that the properties could be independently operated does not answer the question of whether the parties intended at the time they entered into the Amended Master Lease that the lease be an unseverable and single lease of all the properties. Elevation of the subject matter of the lease to such a high level, particularly in the face of the parties' stated intent in section 31 that the Amended Master Lease not be severable, would effectively eliminate the ability of parties to agree to a master lease of multiple real property locations which would not be subject to partial assumption or rejection.

    If, as suggested by Dickinson, the express statement of nonseverability in section 31 did not control this case and the lease sections relied upon by Dickinson conflicted with section 31, thereby requiring the Court to apply rules of construction, the Court would nevertheless conclude that the Amended Master Lease is not severable. The express statement of intent is broad and applies to the transaction as a whole. Spirit's interest is economic, and that interest involves less risk if the lease is nonseverable. Some of the sections relied upon by Dickinson as evidencing contrary intent apply only in limited circumstances outside the control of the parties. Others reflect Spirit's attempt to protect its economic interests when circumstances change. Each reflects and is consistent with the intent expressly stated in section 31 that the Amended Master Lease is a nonseverable lease of all the properties. The conduct of the parties in severing Palazzo is evidence that one property could be separated, not evidence that the parties intended the

12

Amended Master Lease to be severable.

Spirit relies primarily upon *Buffets Holdings*,[17] where several debtors' motion to reject less than all of the restaurant locations included in two master leases was denied. As in this case, the lessors had acquired the rented properties through sale-leaseback transactions with the debtors. Illinois law was the applicable state law, under which the test for severability depended upon the intent of the parties.[18] Even though the restaurants operated independently of one another in various states, the master leases contained an allocation of rent to the various locations, and the lessors were, under certain circumstances, authorized to sever the leases, the court rejected these factors as being conclusive regarding intent. The lessors' willingness to accept a substitute lease as to one location was also rejected as meaning that the master leases were intended to be divisible. Other provisions evidenced that each of the master leases was intended to be unseverable. These included the joint and several liability for all rent, the cross-default provision, and the obligation to pay all rent even if the debtors were unable to use one or more of the locations because of condemnation, destruction, or termination of the ground lease. The court concluded that the individual leases incorporated into each master lease were economically interdependent and that the lessors' interest was in the total package, not the individual properties. "To allow the Debtors to reject one of the leases without continuing to pay the total rent would be to destroy the essence of [the landlord's]

---

[17] 387 B.R. 115.

[18] *Id.* at 120.

13

bargain."[19]

The Court agrees with the analysis of the evidence of intent in *Buffets Holdings* and finds *Buffets Holdings* more similar to this case than the cases relied upon by Debtor. The law of Illinois, like the law of Kansas, focuses upon intent. As in this case, the master leases in *Buffets Holdings* arose out of sale-leaseback transactions where the lessors' interests were in the total package of properties. Although in *Buffets Holdings*, various provisions of the master leases provided for separate treatment of the various locations or severance under certain circumstances, these provisions were not conclusive as to intent. In this case, likewise, the provisions on which Debtor relies address primarily rights upon the occurrence of external circumstances which could impact the performance of the master lease and are not convincing when considered as evidence of intent as to severability. The performance obligations, such as Spirit's obligation to lease all of the premises and Debtor's right to occupy all of the premises upon the payment of a lump sum, evidence intent that the master lease was not to be divisible. The fact that under some circumstances, the master lease could be severed into individual leases and that Spirit agreed to sever one property and lease it to a third party are not particularly significant. The question is what the parties intended when they entered into the Amended Master Lease. If in this case, as in *Buffets Holdings*, there were no provision expressly stating the parties' intent that the Amended Master Lease be unseverable, this

---

[19] *Id*. at 124.

14

Case 12-22602    Doc# 129    Filed 10/12/12    Page 14 of 16

Court, like the court in *Buffet Holdings*, would find that the parties intended an indivisible agreement.

The express statement of intent in section 31 of the Amended Master Lease that it is unseverable removes any doubt as to what was intended. Under Kansas law, it controls the construction of the Amended Master Lease. If, however, rules of contract construction are considered, the Amended Master Lease must be construed as a nonseverable lease of all four properties.

## CONCLUSION.

The Court denies Debtor's motion to reject the Amended Master Lease as to the Palm Valley location only. The Amended Master Lease is indivisible and not severable; it must be assumed or rejected as a whole. The parties' statement of intent in the Amended Master Lease that the agreement is not severable is unambiguous. Under Kansas law, it controls construction of the Amended Master Lease. However, even if the Court were to consider additional evidence of intent relied upon by Dickinson, including other terms of the Amended Master Lease and the parties' actions, the Court would conclude that the Amended Master Lease is not severable and cannot be rejected in part.

Judgment is therefore granted denying Debtor's Motion for Order Rejecting, in Part, the Amended and Restated Master Lease Agreement with Spirit Master Funding, LLC, and sustaining Spirit's objection to the Motion.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a)

of the Federal Rules of Civil Procedure applicable to this matter. The judgment based on the ruling stated above will become effective when it is entered on the docket for this case, as provided by Federal Rule of Bankruptcy Procedure 9021.

**IT IS SO ORDERED.**

# # #